Good morning, ladies and gentlemen. We have four cases before the court today, the last of which is an appeal from the Merit System Protection Board and is being submitted on the briefs. The other three are all patent cases. The first patent case is University of Utah v. Max-Planck-Gesellschaft. That is an appeal from the District of Massachusetts relating to a determination under Section 285. Mr. Chu, you want to reserve how much for rebuttal? Seven minutes, Your Honor. Seven minutes, okay. All right, you may begin. May it please the Court, Morgan Chu on behalf of Max-Planck-Gesellschaft, MIT, the Whitehead Institute for Biomedical Research, Al Nylum, and representatives of the University of Massachusetts. There were two claims in this case. A district court that mistakenly applies the law is effectively committing an abuse of discretion under a whole host of cases, and that's what occurred here. Let me take the sole inventorship claim first. You argue that the district court error did not evaluate the substantive strength of the University of Utah's claims, but Octane Fitness doesn't. It specifically says there's no precise formula for evaluating what's an exceptional case, so it's discretionary. So, first of all, what I believe Octane Fitness actually says, it's just before Note 6, probably in the S-Cut version, 1756, that fees should be awarded in a case that stands out from others, and it goes on in the same sentence, considering the substantive strength of the case. So let me go to the sole inventorship analysis of the court. Let me ask you a question, though. Even if the sole inventorship claim either shouldn't have been asserted or should have been removed sooner, what impact did that claim have on the rest of the discovery or the rest of the case? I mean, the joint inventorship claim, which she found to be not frivolous, and we can talk about that in a minute, the discovery would have been identical with respect to that as it would be with respect to the sole inventorship claim, wouldn't it? So it's a good question or a set of questions. First of all, this was a claim that was pressed over four years. The complaint, the First Amendment, Second Amendment, and Third Amendment complaint, it was dropped on the eve of the filing of summary judgment motion. Here's the practical impact. There's a world of difference if someone is going to be a sole inventor and have all ownership rights as opposed to a joint inventor from which a whole host of other rights might flow, but it's vastly different. There was a $750 million claim being made by Utah. It was premised principally on the sole inventorship. It was the huge motivation for the four years of hard-fought litigation, and on that sole inventorship claim, what the court said was only. It was dropped, and therefore I'm not awarding fees. That doesn't address what Octane Fitness told us, which was to look at the substantive strength, and then it mentions a number of factors such as whether it was frivolous, whether or not it was subjectively frivolous. What it said is, among other factors, you can consider the substantive strength. It went out of its way to say that that was not determinative. I agree. I agree, and if it was dropped in the first three months or six months or nine months of the litigation, that would be one thing. But that's your problem, and it's a flavor problem. It's the same problem in Rule 11 and Section 1927. In all those kinds of cases, district courts sitting there on the spot saying, and I'm looking at the totalitarian circumstances, and yeah, there's a—I mean, look, there's obviously some fibbing going on in this case, but who knows what, when, and when do the courts get to the point of saying, oh, okay, now we focus, we're going to lose, we drop this. I mean, as a trial judge, I'd have people come in just before trial and drop their claims. I appreciate that members of this panel have been on the firing line as a trial judge, but here are the core facts which does make this stand out. All of the charging allegations from the original complaint through the Third Amendment complaint were in the possession of Utah's knowledge. Because they're all based on what Dr. Bass did, said, what meetings she had, whether or not she collaborated with Dr. Tushel, Dr. Al-Bashar, or Mr. Landeckel. Well, the facts as they came out were completely at odds from the allegations in the four pleadings filed by Utah. So one would normally expect that Utah or its counsel would interview Dr. Bass. And if they didn't interview Dr. Bass in advance of making those allegations, not once, but four times, there's something wrong. Isn't it true that the trial counsel that was involved on the second or third amended complaint actually inherited the First Amendment complaint from the original counsel? So the answer is yes, but, and this is an important but, we're not trying to separate out who was at fault. The question is the allocation of fees between Utah and Utah or its representatives plainly were at fault. At a much earlier time than when the allegations were dropped, Utah's continuing counsel had to have known the allegations were false, not only because of Dr. Bass's own testimony, but their own expert witness contradicted the major charging allegations. So two witnesses, one key fact witness for Utah, one key expert, neither of them supported the charging allegations in a $750 million case. So I still don't, I mean, I get your claim that, well, they couldn't possibly have hoped for that kind of damage award barring success on the sole inventorship. But you still haven't completely answered my question whether it would have altered the scope of discovery. It's pretty clear that the discovery was what it was as it relates to the interaction between these two purported inventors. And that Dr. Bass, I mean, the court made very specific findings about her contributions and so there's no question that she was a legitimate scientist who shared information regarding this invention. So you were going to have to probe into that as it relates to the joint inventorship claim, correct? Correct. So let me take the way the question was originally framed and it's the same question at the end. Would discovery have been different? The answer is yes. I wouldn't be, counsel would not be doing a decent job as counsel if one litigated a case that was worth, I'll say hypothetically, $100,000 versus a $750 million case. So that needs to be taken into consideration. Now I would agree with one aspect. Would we still have taken Dr. Bass's deposition? Yes. But many other depositions, many other motions to compel and other things might not have been done if this was a much smaller case. Come on, in this kind of litigation and with the kind of representation that Max Planck retained, you can expect a full airing of the facts. That's how I practiced for 20 years too and that's how big firm litigators approach it and if the defendant hires a big firm to defend him, they expect that they'll get a full representation. Really, come on. Well, I respect your Honor's point of view, but in today's world and yesterday's world when I first... Of course things have changed, yeah. Well, when I first started practicing law, including that world, clients do care about the potential liability, the size of the case. There were also vast differences in discovery, I'll just give you one example. But intellectual reputations matter too to universities and they, like newspapers, will defend more than just based on the bottom line. I agree with that. Let me make one point about the joint inventorship where the court did, the district court did engage in more of an analysis. But if one looks at it with some care and one looks and I'm thinking in particular the part of the analysis which is page four of the joint appendix, it's page four of the district court's opinion. She concludes that the record supported the claims, that the mini-review supported the claims. Now let's think about that. The mini-review itself was a piece of prior art. There was a three-week period, which I'll address in a second. It cannot be the case that a piece of prior art by itself would allow someone to make a joint inventorship claim. Otherwise all of science and all of patent law would be turned on its head because every advance in science is built on all the work that came before. So let me look at that three-week period. Their expert agrees that there was nothing done, zero, by Dr. Tuchel who received a courtesy copy of the mini-review during that three-week period. Months later he was doing experiments and their expert testified. He was doing his own research. He wasn't using anything from Dr. Bass's mini-review and he tested many different structures, many different possibilities. So their own expert witness agrees that there was no learning from the mini-review. So although the district court does list some factors, in fact, looking at the record, it's not supported by the conclusion. So the district court made some specific findings with respect to Dr. Bass. It said, when all reasonable inferences are drawn in favor of Utah, the evidence supports Utah's theory that Tuchel incorporated Bass's hypothesis regarding the three-prime overhang into his research, that her prediction was a significant contribution to the ultimate patent intervention, and that this contribution was corroborated by existing documentation. And then she said, ultimately, the only question is whether their interaction constituted sufficient collaboration. And she concluded it didn't. Let me address that, but I do want to save some time for rebuttal. If you look at the actual claims, and in the joint appendix, there's a good example. It's claim one from the 9-6-8 patent, and it's page 4054. In that claim, as with the other claims, are synthetic creations, because it says, plainly, that it's non-enzymatically cleaned. That's page 4054 of the joint appendix. What Dr. Bass did was, she speculated that, in nature, a naturally occurring enzyme, for shorthand, called Dicer in the pages, was causing some cleavage. Right, I get all this, but what you're saying, then, is you're not just asking us to review the 285 determination, you're asking us to go behind the summary judgment analysis and actually reject findings of fact made by the trial court. That's a big leap, isn't it? No, she, so what I think we're both referring to is her order denying the motion for attorney's fees. So she grants summary judgment, and then there's another person- No, I'm quoting from the summary judgment order. In other words, you're saying that her underlying factual findings in the summary judgment order, you don't think were supported by the record. No, of course, we were in favor of the grant of summary judgment, and maybe I misheard your honor, but I thought you might have been reading from- No, I'm reading from the summary, in other words, she said that most of the factors go in favor of Utah on summary judgment. There's only one factor that I have to analyze, and that's collaboration, and that's where you ultimately want Utah lost. So let me address that in particular, because collaboration is very important. It's a keystone for the joint inventorship. In all of the four sets of pleadings, there was an allegation of direct collaboration with Dr. El-Bashar and Len Dekel. What's the record? Dr. Bass never communicated with them in any way, orally, by email, by smoke signals, or in any other way. Those allegations are completely false. She did have some communications with Dr. Tuchel, they would attend professional meetings, they would see each other, but in all of her testimony, none of it rose within a shouting distance of collaboration. That linchpin was missing, so thank you very much. All right. You've used up almost all your rebuttal, I'll give you three minutes for rebuttal, and we'll add two minutes to the other side if necessary. Thank you, Your Honor. Okay. May it please the Court. My name is Mark Carlson, I'm with Hages, Berman, Silva, and Shapiro, and we represent the University of Utah. I think the issue here is pretty straightforward, it's did the district court apply the correct law, and did the district court make factual findings that were not correct, clearly incorrect? And I think both of these- I thought pretty darn extensively, and I believe persuasively, that there were allegations in the complaint that any reasonable counsel reviewing and talking to Dr. Bass would have known were false. For example, what sticks in my mind is that dinner with Dr. Tucci, where Dr. Bass talked to Dr. Tuchel about her work at this Uppsala, Sweden meeting, and in her deposition, she's asked, do you think that based on a single dinner conversation with Dr. Tuchel, the two of you were collaborating, there was- her answer- there was nothing in that conversation about the things that were questioned in the past, and there's a lot more. But I find that disturbing, because any competent counsel writing a complaint talks to the prime witness. Yes, Your Honor, and we submitted evidence that we, in fact, did interview her. Let me address that comment. The deposition had pages and pages of questions about what happened in that conversation in Uppsala. And the quote that Your Honor just gave me, I've got to confess, I don't know what she was saying. I don't know what she meant when she said, the things that were questioned in the patent, I don't know what she was talking about. But she did, in fact, testify quite clearly about the things that she did tell Dr. Tuchel. And what she told him was that she had just done a set of experiments which confirmed that RNAi does not occur in the absence of DICER. She did this on the nematode worms she'd been studying for years, and this demonstrated that the molecule that is the product, the molecule that mediates RNAi is a product of DICER. And that... What took so long for your eyes to open with respect to the extent to which the sole inventorship claim was completely unsupportable? Well, we did not regard the sole inventorship claim as completely unsupportable. What took so long was several, for us to dismiss the claim, were several things. One is the fact that the Tuchel 1 patents had recently been allowed, and so we had to would have pertained to those, and we decided we didn't want to assert them as to those. So those were... But this is years of litigation, four different iterations of the complaint, and you still haven't figured out from talking to Dr. Bass or otherwise that she didn't even consider herself to be the sole inventor of his inventions? Well, again, one has to be very clear about what claims you're talking about.  One set of claims discusses, or claims, the synthesis of a DS RNA molecule of a certain length with three prime overhangs that mediates RNAi. If you did have faith in your argument, then why didn't you just let it run through course and let the judge rule on summary judgment on that issue? We submitted a declaration... I don't have anything here. I agree that the timing is suggestive of that, because it happened to coincide with... I think it's a very significant part of the totality of the circumstances in this case. However, it's significant, Your Honor, that there were hundreds of claims that were of the variety I just described, that is, the claims that just claim the molecule. Those are the sole inventorship claims. Those claims are predicated on the named inventors, Tuschel et al., not having made an inventive contribution to the claim. We would have had to show to the jury for each of those claims that there was no inventive contribution by the Tuschel inventors. We determined that that would be a nightmare, it would be a logistical nightmare trial, and that we could cut those because our damages theory didn't rely on the sole inventorship claim. We had the same damages theory, whether it was sole inventorship or joint inventorship. So it didn't matter that we had them, and it simplified the case. Let's go to that question, because let's assume I don't buy your argument that the sole inventorship claim was strong, or at least even very viable. What is your response to Mr. Chu's argument that it was a fundamentally different case if it was a sole inventorship claim versus a joint inventorship claim? The theory of damages was that what drove the value of the patents was the desire on the part of Al-Nilam, Al-Nilam essentially controls the patents, to maintain exclusivity over RNAI technology. And so whether or not it's sole inventorship or joint inventorship, they don't have exclusivity. The University of Utah could have run off and licensed anyone they wanted, and that would have been an issue. And what our damages expert went through was to examine another instance in which another entity was a joint inventor, and what they did to try and corral that joint inventor back into the group. It was University of Massachusetts that wanted to go its own way, do its own licensing, and in order to corral them and bring them back into the group, the co-licensing group. And it was that transaction that was the basis for the damages theory. And so it didn't matter whether it was sole or joint inventorship. The damages number would have been the same. So we could drop that claim and greatly simplify our case for trial by getting rid of the sole inventorship claim. And that is not something that distinguishes this case from any other case. That's a very important thing that trial lawyers do before they go to trial. They prune and simplify the case for presentation to the juries, and that's very valuable to courts. And I think this court should tread very carefully in overriding the court's discretion on that, because district courts rely, courts of appeal, they're busy. I'm not sure that argument helps you, Counselor. I mean, it seems to me that if you start out a case, you have two separate theories that are going to produce the same damages, damages rest on two separate theories, and you jettison one of them right before summary judgment, then I begin to think whether this is an exceptional case, whether this is a type of analysis that should be done at the outset of the case. You're taking a risk, and you're saying, I'm going to play both sides of the coin, knowing that one may be counterfeit. Your Honor, the court, Your Honor, Judge Reiner, you may recall that we were up here once before, and Your Honor was on that panel. We filed this case, and there was a series of motions to dismiss. And the last of those was taken up on appeal. At the time, we had pending discovery requests, and the appellants sought a stay, and they got one. And so there was no discovery until after we'd gotten through the ruling here at the Federal Circuit, which affirmed the district court in our favor. And then we had to go to the Supreme Court, and we had a petition for writ of certiorari, and we had to fight that. And then finally, finally, and it was almost three years later, the case came back down for discovery. And it was after we got discovery that we learned about the University of Massachusetts trying to bolt from the group and do its own separate licensing, and what Al Nylum had done to try and corral them back in, in terms of paying them, offering them a license. And because of that, the damages theory, I think, came out differently than what we would have anticipated at the beginning. There are facts that we didn't know about and couldn't know about until the discovery stay was lifted. I failed to see, though. I'm trying to follow your damages theory. And I failed to see how it's the same, as if, presumably you had prevailed on sole inventorship, and then licensing was entirely in the possession of the University of Utah. Wouldn't that have been a more valuable asset? That is exactly what we thought at the time that we filed the complaint. And so we wanted to make sure that we had both theories, and we did. We asserted both theories. But it was after we got discovery, and when we found out what they had offered University of Massachusetts, it wouldn't have made a difference. They offered the University of Massachusetts the equivalent amount as if UMass owned the entire patent and could license it to the world. Is that what you're telling me? I'm not as familiar with how the analysis in that report went to answer that question exactly. I don't believe they offered the value of the patent to University of Massachusetts. I agree. So that answers the question. But the licensing number, the numbers that were offered to University of Massachusetts were the ones that were used to derive the $750 million damages figure. That is what our expert used. And they were numbers that we didn't know about until we had discovery. Counselor, in Noctain Fitness, we said that there's no precise formula that we applied or that's applied in this case, but that a case that involves subjective bad faith or an exceptionally meritless claims. So in this case, the other side is saying that there was subjective bad faith, that some of the testimony was deceptive, that there was lying going on. What's your response to that? I don't take their argument to be, and perhaps I'm mistaken, but I don't take their argument to be that our witnesses lied. I think what they're actually saying is that Dr. Bass told the truth. I think what they're trying to say is that the lawyers lied. I think they're saying that the lawyers failed to either adequately understand. I don't think that Dr. Bass is shown to have lied. But I think the lawyers, what they're arguing, I believe it shows, the lawyers failed to adequately conduct their investigation. That is how I read their argument. I think that's what they're arguing. Your Honor, let me address that. There was a large scattershot of allegations that are attacked here. We have tried to show that they are not playing fair, that they either snippeted out portions of deposition testimony or snippeted out allegations, but they presented this in a way where actually the testimony does not refute the allegation. We've got tables that we presented that we tried to show that. One point that's significant is that it is not unusual in a case where you file a complaint and it has allegations in it, and then you take discovery and the facts, as they develop, don't necessarily support every single allegation in the complaint. And that may or may not be fatal to the complaint, and if it is... It may be fatal to a particular cause of action. It may be fatal to an allegation in a cause of action. But at that point, ethical counsel sits down with opposing counsel and says, OK, this is irrefutable. We're withdrawing that paragraph or that claim or whatever. If it were irrefutable, certainly. If it were irrefutable, certainly. There's a lot of omissions in Dr. Bass's testimony. Those have to be looked at in the context, first of all, of the questions that were asked, right? Because they were leading questions, and often... It's cross-examination, counsel. I'm not objecting to that, but often they will quote the answer without quoting the question. And when you go back and you look at the question, it doesn't refute the allegation. What came didn't refute that. But more importantly, she had a lot of testimony. They asked these questions again and again and again, and most of her testimony was perfectly consistent with the facts that we relied on from the complaint to support the cause of action. So in the rhetoric, all the questions in this table aren't actually the questions that were asked? All of the... Either the allegations, in many instances, have been edited, parts have been left out, brackets have been inserted to insert language. They've been edited in a way that they don't represent what we said in the complaint. They omit material information, and so it doesn't correspond to what we said. And in the quotations of the deposition, they picked parts that they liked, which may or may not correspond with the allegation because of what the question was or what the series of questions were that preceded it that provided context. And they don't provide that. It is in much of the appendix. So if you look at what they cite and then look at the series of questions and answers that preceded, the court will see that frequently she is perfectly consistent with what we alleged in the complaint for the parts that we relied on. All right. Your time is up. Thank you. Three minutes, Mr. Chair. Two points. First, it's a claim-by-claim analysis. So it would be proper to award attorney's fees for one claim and deny it for another claim. That's the law before Octane Fitness and Highmark. But not if the activities are essentially inseparable. I mean, you've got a judge, a trial judge, who lived with this case for years. You're the one who chose to take an interlocutory appeal on a denial of a motion to dismiss and to stay all discovery that would have brought all this out a lot sooner. So the trial judge is down there, and she's living with this case. She understands the delays. She understands the extent to which the discovery impacted the analysis of the damages. Why shouldn't we say that it was her call ultimately? So there's nothing on the record to say that all of the activities would have been the same. I did answer the court's question about whether they would be different. If the court sends it back to the district court, the district judge would be in a position to determine whether the activities would have, in fact, been the same for a $750 million case. So you want to spend more money to have the district court come out the same way? Well, since I have client representatives in the courtroom, I definitely don't want to spend more money. But we do want it to be done right. How long after the Supreme Court denied cert in discovery open, how long was it before the issues were joined and the resulting dismissal? So this court decided in August 2013 the jurisdictional issue. I think it was by November 2013 that cert was denied, although I'm not absolutely positive. It was more than a year later that the Third Amendment complaint, with all the same false allegations, was filed in this case. Thank you, Your Honor. Can I ask a question? When you say false allegations, do you really mean that? False meaning a subjectively deception. Are you saying that counsel tried to deceive the court? Is there bad faith practiced on the court? So I obviously don't know what was in another human being's mind, but I do know this. I do know exactly what the allegations were and maintained through four pleadings. I know exactly what Dr. Bass said. I know exactly what their experts said. So they were untrue, and I assume that proper interviews were conducted, and if they were conducted, then they would be false. If proper interviews were not conducted, it's still a problem for Utah because they shouldn't have filed the complaints. Thank you. Thank you. All right, thank you. That case will be submitted.